Mr. Rhodes, will you reintroduce yourself, please? Yes, sir. My name is John Rhodes. I'm from the Missoula Office of the Federal Defenders of Montana. I represent Mr. Zurmiller this morning. Initially, Deputy Flynn stopped Mr. Zurmiller's car because of an alleged unlawful U-turn. We've established that it wasn't an unlawful driving maneuver. If that is the only basis that justifies a stop, this stop was illegal. Well, the plates and not in the file are feedback from the computer. Isn't that enough? Your Honor, the government has cited the Rojas Milan case where a not on file or plates that didn't come back as being registered justified a stop. In that case, the officer was familiar with the licensing scheme and saw that there was something suspicious about the numbers on the plates. Here, there's no evidence there was anything suspicious about the plates or the registration that was posted in and of itself. All that was known was that there was a records check ran and it came back not on file, which could mean one of two things. That the registration displayed on the vehicle was illegal. It could also mean that it was a newly registered vehicle and the registration simply had it kicked into the computer system. If that's a basis to stop a vehicle, every person who buys a new vehicle is going to have a window of opportunity where they're exposed to a stop. Was it a new vehicle? No, it was an early 1980s model Chevy truck. 1980s? Yeah, I believe it was a 1980 to 84 model. And so it wasn't a new vehicle in the sense that it was fresh off the assembly line, but it turned out to be a newly registered vehicle. Moreover, although this was deemed initially at least a traffic stop, that's not how the questioning went down. The first two questions were, I need to see your registration, I need to see your driver's license. Before those issues were resolved, in other words, before Mr. Zermiller even provided those documents, the questioning immediately went to, are you a convicted felon, do you have firearms? So in order for that questioning to be proper and not to exceed the scope of what at first was reported as a traffic stop, there had to be reasonable suspicion to question Mr. Zermiller on those issues, and that's what the district court found. As to that, what about the tip from the gun shop dealer? The gun shop had reported that Mr. Zermiller had in a strange way purchased ammunition, and it was ammunition that could be used in this recently reported stolen gun. One thing that's not clear in the record but is a fact, and you can check it on a map, is that I believe the ammunition was purchased in Wisdom, Montana. The stop occurred in Jackson, Montana. Those two towns are in the middle of the Big Hole Valley, which is a huge valley in southwestern Montana. The gun was stolen from an area called Grasshopper. I don't think it's an incorporated or even an unincorporated town. And although it's in the Big Hole Valley, it's actually, if I remember, I went backpacking there a few years ago, it's almost in the mountains, so it's some miles away from Jackson and Wisdom. And I make that point because there's no evidence that Mr. Zermiller was ever in the Grasshopper area. There's certainly no evidence that he was seen near the vehicle in which the gun was stolen from. All the evidence is that he was in town the night the gun was stolen, and then later he purchased this ammunition. Under the theory that that creates reasonable suspicion, any person who purchased ammunition for the gun that was reported stolen in that entire area of the Big Hole Valley could be stopped. And we believe that's just not objectively reasonable. It's not specific to Mr. Zermiller. Counsel, you started by telling us the order of the questions that Officer Flynn asked. He asked first about the license and registration, which would seem to be the kind of questions that Officer Flynn would ask somebody who had illegally made a U-turn over a couple of yellow lines and only then asked about the felon and guns. Had Officer Flynn asked those questions in the reverse order, would this have been appropriate? Then the court would... Would it be a stronger case for the government? No, it would be a weaker case because then the court would have to do what the district court did to justify the stop, go to the gun investigation as creating the reasonable suspicion. The government's strongest justification for stopping Mr. Zermiller is the fact that he made the U-turn. Yes, which turns out to be an unlawful basis for the stop because there was nothing illegal in the U-turn in and of itself. Is that a mistake of law or a mistake of fact? It's a mistake of law because the deputy testified that it was illegal to make a U-turn in Jackson, Montana, that it isn't illegal. It's not a state law. It's up to local authorities. Jackson's an unincorporated town. Therefore, they don't have such rules. Beaverhead County, which is largely a rural county, doesn't have such a rule. You can do U-turns in Beaverhead County, in Jackson, Montana, as long as you do it in a safe manner. The other grounds that the district court relied upon to justify its determination of a reasonable suspicion was the felon in possession investigation. The district court suggested that rather than a mistake of law, it was a mistake of fact. In other words, that the deputy, and he did that in a footnote, that the deputy wasn't aware that Mr. Zermiller, despite his felony convictions, could possess guns and ammunition. But that can't be because the deputy, as well as the sheriff, testified that they were investigating with ATF the rights of Mr. Zermiller to possess guns and or ammunition, despite his felony conviction, and they didn't have an answer back. So the deputy wasn't mistakenly believing that he couldn't, because the deputy himself said, I was investigating that and trying to get an answer. I simply didn't have an answer yet. So that cannot be a mistake of fact. Counsel, why don't we hear from the government and then you can respond. Thank you, sir. Mr. McLean. Yes, Your Honor. I am Chris McLean representing the government in this case. It seems quite apparent, at least from the government's perspective, that the police work engaged in by Deputy Flynn in this case was quite appropriate and was based upon his experience and reasonable inferences from the facts that he was aware of as he conducted his investigation. On October 12th, he saw Mr. Zermiller arrive in Wisdom, saw him sitting at a bar and recognized him as a person he dealt with back in 2000 and a person he learned in 2000 was, in fact, a convicted felon. When he noticed Zermiller in town, he ran a check and found out that Zermiller's Montana driver's license had been suspended, and then he began looking around for a vehicle that Zermiller might be driving. On the 12th, he wasn't sure, but he did find this Chevy pickup bearing Nebraska plates sitting at a local motel, ran the plates, they came back not on file. On October 15th, Mr. Jared Wise reported his rifle had been stolen from a location in Beef Redhead County. Deputy Flynn was at the Sheriff's Department that day and listened to Wise make this report. Wise described the rifle as a Model 77 Ruger 220 Swift. Not a Ruger, right? Right, not a Ruger, a Ruger. When Deputy Flynn got home that night, there was a message on his answering machine from Ms. Moore, who owns the Mercantile and Wisdom, the Conoco-slash-Mercantile, and she said, you know, Zermiller was in my store today and he was buying ammunition, and he requested ammunition for a Ruger M77 220 Swift. He also told me, I'm taking this gun out to see how it shoots, indicating that he had purchased ammunition for this particular rifle that Wise had reported stolen and that it indicated he had just obtained the rifle because he was going to go out and see how it shot. Counsel, did you rely on the U-turn here as applying grounds to Officer Flynn? No, Your Honor. Your Honor, in fact, at the suppression hearing, Officer Flynn set forth five reasons that he stopped the vehicle. They were, first, that Zermiller was a suspect in this rifle theft, and once he obtained this information from Ms. Moore, the record reflects that Zermiller, in Flynn's mind, was a suspect in the rifle theft. He had also learned from prior connection with Zermiller that Zermiller was a convicted felon, and his thought process and the inference that arose was, well, if Zermiller has this stolen firearm and he's purchasing ammunition, which he's also not allowed to possess, then he may be a felon in possession of a firearm. That was his testimony at the suppression hearing. On the 15th, he started this surveillance of Mr. Zermiller. Actually, it's the 16th. And during that morning, he's sitting across from the Nez Perce Motel, watching Zermiller take things in and out of the motel room and putting them into this Chevy pickup with the Nebraska plates. He runs the plates. They're not on file. But he can also watch Zermiller drinking beer and putting beer cans here and there. So another reason that he testified he stopped him was that Zermiller was drinking beer that morning and then driving this vehicle. We have the plates not on file. During the course of his surveillance on the 16th, he checked again. So I want to make sure I understand this. Right. We understand the various things that were sort of accumulating in Officer Flynn's mind. He does do it at the time when Zermiller makes the U-turn. Right. Could he have stopped him at any other point prior to the U-turn? I think he could have. He could have stopped him after he saw him because he saw him drinking. Right. But the problem is because he thought that he might be involved in the theft. Well, we don't want to parse these out. That's what the defendants want us to do. But that's not what Officer Flynn is required to do. He's allowed to use all these objective facts in determining reasonable suspicion. And at the time, his suspicion was growing throughout the morning, and he had these five reasons to make the stop. The practical reason that he could not stop the guy, stop Zermiller as he drove down the highway, was because he was conducting the surveillance in some sort of unmarked vehicle. It might have been his personal vehicle. And he testified that he needed the assistance of a livestock inspector to actually turn on the flashing lights and make the stop. And as he came into Jackson that morning, he observed Livestock Officer Brown, either pass him on the highway or he saw him in the vicinity, and he requested Brown's assistance to make this traffic stop. Now, the reports reflect that he made a traffic stop, but it wasn't necessarily for a traffic violation. That's the term that this officer used to describe the fact that the defendant was driving down the road and they made a traffic stop. But he had these five reasons that he stopped Zermiller's vehicle. Judge Malloy, in reviewing the evidence that we had used at the suppression hearing, found that three of those reasons justified the stop. First, the plates were not on file. Second, Judge Malloy felt Deputy Flynn was reasonable in believing that the defendant was involved in the theft of Wise's rifle. And finally, Judge Malloy felt that Flynn was reasonable in believing that Zermiller could be a felon in possession of a firearm. And so all these factors, these objective facts that Flynn had, led to a reasonable suspicion to stop that vehicle. Thank you, counsel. Once... I thought you had finished, excuse me. I just wanted to go to the questioning that occurred. And the next issue the defendant brings up is that once the stop was made, that the questioning exceeded the scope of the stop. But actually, the first question is, could you show me your driver's license, registration, proof of insurance? Before the defendant produces his driver's license, he's already produced two firearms. The sequence of events was the defendant couldn't find his driver's license in the front part of the cab. While he's looking, Deputy Flynn says, do you have any felonies? The defendant answers, yes. Have you been drinking? Because he'd seen him drinking in the morning. The defendant says, one beer. The officer says, do you have any firearms? He's still looking for his driver's license. And the defendant says, I have a rifle. The defendant actually reached and pulled his .270 rifle out from behind the seat and hands it to the officer. The officer asked, do you have any more weapons? And he said, no. He still hasn't found his driver's license. And Zurmuller says, I think my driver's license is in this toolbox in the back of the pickup. So he gets out of the pickup, opens that toolbox to find his driver's license, and the officer sees laying in that toolbox the .44 Magnum pistol. Well, the driver's license was in there as well, so they obtained the .44 and the driver's license. But by this time, Zurmuller's already been caught with two firearms. So this reasonable suspicion continues to build throughout the encounter, and Zurmuller ends up turning over or the officer finding several other firearms. And it all really turns on what actually is really good police work by a deputy sheriff out in the middle of nowhere, Montana. And we're urging this Court to affirm Judge Malloy's decision that, in fact, all this evidence was obtained legally. Thank you very much, Your Honors. Thank you, Counsel. Mr. Rhodes, you have a little reserve time. Thank you. As an initial fact, it's strange that Mr. Zurmuller, who's accused of mispronouncing Ruger as Rugger, is being investigated or suspected of stealing this gun, yet he knew the exact title of the gun. Although he said Rugger, he still said Model 77-220 Sweat. So if he stole this, how would he know the name of it? And if the theory is that he doesn't know the difference between Ruger and Rugger, how would he know the rest of the title of the gun? But you're not challenging the credibility of the clerk who says that he said Rugger. No, what I'm challenging is the fact that that somehow shows it's a stolen gun. If he knows the whole title of it, how would he know that, unless he's very familiar with guns? If he's very familiar with guns, I think everybody in this courtroom has never heard of a Rugger. Everyone's heard of a Ruger. So I'm just saying that doesn't necessarily create suspicion that he stole it, because he was able to give the full title of the gun, which would show that it wasn't something that he obtained and had never heard of this before, never knew really what it was, and that's why he mispronounced Ruger as Rugger, yet he knew the rest of the title. So I think that undermines the officers, what the government's claiming created reasonable suspicion for the officer. The government just noted at the end of its argument that the reasonable suspicion built as the stop in questioning and revelation of guns occurred, yet the government also said the U-turn wasn't necessary for the stop. The stop could have been made far before that, and its explanation why that didn't occur is because Deputy Flynn was in his personal vehicle. The reason Deputy Flynn was in his personal vehicle is, in his own mind, Deputy Flynn didn't believe he had reasonable suspicion to make this stop. Otherwise, he would have got in an official vehicle, and he could have made this stop when the government's claiming he had reasonable suspicion, yet Deputy Flynn didn't think that. The government also used the phrase maybe in terms of whether Mr. Zermiller was a felon in possession. It said maybe he was a felon in possession. In Montana, your rights to bear arms and possess ammunition are restored. That's why Deputy Flynn, to his credit, had his sheriff check with ATF. That answer was outstanding. So in Montana, you're way off base if the guest says, well, I know there's a felon conviction out here. We have this report, credible report, of ammunition being purchased. Therefore, there's reasonable suspicion that somebody's a felon in possession of ammunition. That's entirely not true in Montana. It's probably true in a lot of other states, but it's not true in Montana. Our position is reasonable suspicion did not support this stop. Therefore, the stop and all the resulting fruits of the poisonous tree should be suppressed. Thank you. Let's take a question. Given that his driver's license in Montana had been suspended and he was driving a car with Nebraska plates, would it have been a reasonable inquiry for Flynn to want to know whether Zermiller was now a resident of Nebraska and might not have had his rights restored? My understanding, Your Honor, and I'm fairly confident of this, it's a question of what state you were convicted in, not where you live. So, for instance, you could be convicted of a felony in Montana, move to Washington, and your rights are restored by the state of Montana. He didn't have any reason to know that Zermiller had been convicted of a felony in Montana? That was being checked. I don't know the substance of the conversation between him and ATF. He didn't have any reason to know that Zermiller hadn't been convicted of a felony in some other state, for example, Nebraska? In his testimony, he didn't detail what ATF told him. He ran his records. I presume he was aware of his record. In fact, he was. He mentioned he was aware of it was a North Dakota conviction. And it turns out North Dakota is one of the other few states that restores rights. Thank you. Thank you, Counsel. The case just argued will be submitted for decision,
judges: O'scannlain, Rymer, Bybee